UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JEFF J. RITACCO,

Plaintiff,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

Defendant.

No. 13 C 6757

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Jeff J. Ritacco filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and have filed cross motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

2d 973, 977 (N.D. Ill. 2001).[1] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on May 21, 2010, alleging that he became disabled on December 31, 2005, because of bipolar disorder, depression, and ADHD. (R. at 25, 159–60, 186, 189). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 25, 70–71, 75–84, 102). On April 13, 2012, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 25, 39–69). The ALJ also heard testimony from Leigh Ann Bluhm, a vocational expert (VE). (*Id.* at 25, 39–69, 157).

The ALJ denied Plaintiff's request for benefits on April 26, 2012. (R. at 25–33). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity from December 31, 2005, his alleged onset date, through March 31, 2010, his date last insured (DLI).[2] (*Id.* at 27). At step two, the ALJ found that Plaintiff's depression and bipolar disorder are severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listings enumerated in the regulations. (*Id.* at 28–29).

---

[2] The ALJ determined that Plaintiff last met the insured status requirements of the Act on March 31, 2010. (R. at 27). Therefore, Plaintiff must establish that he was disabled between December 31, 2005, and March 31, 2010, in order to qualify for benefits. *Bjornson v. Astrue*, 671 F.3d 640, 641 (7th Cir. 2012) ("only if [claimant] was disabled from full-time work by [her last insured] date is she eligible for benefits").

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[3] and determined that he can perform a full range of work at all exertional levels but with these nonexertional limitations: "[Plaintiff] can have no more than occasional brief and superficial contact with supervisors, co-workers and the general public and is limited to simple, routine and repetitive tasks." (R. at 29–31). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that through his DLI, Plaintiff was unable to perform any past relevant work. (*Id.* at 32). Based on Plaintiff's RFC, age, education, and the VE's testimony, the ALJ determined at step five that through his date last insured, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed, including assembler, sorter, and hand packer. (*Id.* 32–33). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability, as defined by the Act, at any time from December 31, 2005, through March 31, 2010. (*Id.* at 33).

The Appeals Council denied Plaintiff's request for review on July 22, 2013. (R. at 1–6). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is

weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

Plaintiff began treating with Michael Demaertelaere, D.O., in July 2005. (R. at 261–318). On June 16, 2008, Plaintiff complained of bipolar disorder, requesting a pill to make him feel better. (*Id.* at 294). Dr. Demaertelaere recommended that he follow up with a psychiatric specialist. (*Id.*).

In October 2008, Plaintiff began treating with Paulette C. Trum, M.D., a psychiatrist with Joliet Center for Clinical Research.[4] (R. at 337, 341). In her initial status examination, Dr. Trum found that Plaintiff had hyperactive behavior, pressured speech, anxious mood, constricted affect, and distracted thought process. (*Id.* at 342). In November 2008, Dr. Trum was treating Plaintiff with Zoloft and added Wellbutrin. (*Id.* at 341). The next month, Plaintiff reported symptoms of depression and anxiety. (*Id.* at 344). In May 2009, Plaintiff requested that his Zoloft dosage be reduced, complaining that he can't perform sexually. (*Id.* at 344). On December 7,

---

[4] Unfortunately, Dr. Trum's handwritten notes are nearly impossible to decipher.

2009, Plaintiff's wife reported to Dr. Trum that Plaintiff can't keep a job, is unable to concentrate, and has bipolar symptoms. (*Id.* at 341).

On February 22, 2010, Plaintiff complained of depression and dizziness, stating his symptoms were getting worse and were not alleviated by his psychiatric medications. (R. at 274). He also complained of poor memory and concentration. (*Id.*). Dr. Demaertelaere referred Plaintiff to a neurologist, continued Zoloft 100mg, and recommended he consult with his psychiatrist regarding his medications. (*Id.*).

Plaintiff saw a neurologist on April 1, 2010. (R. at 327–28). Plaintiff reported his history of bipolar disorder and depression, dating back to his youth. (*Id.* at 327). He complained of episodes of blank stares lasting several minutes, four to five times daily, severe mood swings, memory loss, and a short attention span. (*Id.*). Plaintiff reported periodic incidents of rage, including beating up his neighbor and losing his cool at work. (*Id.*). He feels "a little bit better" with Zoloft and Depakote but continues to have "spacing out spells." (*Id.*). Sreepathy Kannan, M.D., diagnosed bipolar disorder and scheduled a follow-up appointment. (*Id.* at 328). On April 29, 2010, Dr. Kannan opined that Plaintiff has bipolar disorder with "a lot of anger issues." (*Id.* at 329). Plaintiff has three to four episodes daily "where he does not remember what is going on at that time." (*Id.*). An MRI of the brain, an EEG, and blood work were all negative. (*Id.*). Dr. Kannan recommended that Plaintiff follow-up with his psychiatrist. (*Id.*).

On May 31, 2010, Dr. Trum concluded that Plaintiff was unable to work and should be on disability. (R. at 340). On July 27, 2010, Plaintiff reported doing well.

(*Id.* at 339). On October 26, 2010, Plaintiff stated that he was off all his medications; his wife reported that he was still angry. (*Id.*).

On September 15, 2010, Plaintiff completed an adult function report. (R. at 198–205). He reported difficulties with memory, motivation, concentration and focus, stating that he frequently zones out when doing activities. (*Id.* at 198–200, 203). Because of anger and irritability issues, he avoids driving and shopping. (*Id.* at 201). He becomes argumentative around authority figures. (*Id.* at 203). In fact, other than his wife and brother, he avoids people whenever possible. (*Id.* at 202). Plaintiff experiences side effects from his medications—Zoloft causes sexual dysfunction and Depakote causes his hands to shake. (*Id.* at 199, 204). In January 2011, Plaintiff reported that his Lithium prescription caused headaches and made it impossible to focus and concentrate. (*Id.* at 226).

On September 20, 2010, Jerrold Heinrich, Ph.D., a state agency consultant, reviewed the medical records and opined that there was insufficient evidence to make a determination of disability prior to Plaintiff's DLI. (R. at 345–58). On December 16, 2010, Kirk Boyenga, Ph.D., another state agency consultant, affirmed Dr. Heinrich's conclusion. (*Id.* at 359–61).

On February 22, 2011, Dr. Trum concluded that beginning on or before March 31, 2010, and continuing to the present, Plaintiff had an affective disorder consistent with Listing 12.04. Specifically, Dr. Trum found that Plaintiff had psychomotor agitation or retardation, difficulty concentrating or thinking, and a manic syndrome characterized by hyperactivity, pressures of speech, and easy distractibil-

ity. (R. at 367). Dr. Trum opined that Plaintiff had marked restrictions of daily liv-ing, marked difficulties maintaining social functioning, and four or more episodes of decompensation. (*Id.* at 368). Dr. Trum further concluded that Plaintiff was mark-edly limited in his ability to carry out very short and simple instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, ask simple questions or request as-sistance, accept instructions and respond appropriately to criticism from supervi-sors, get along with coworkers or peers without distracting them or exhibiting be-havioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, travel in unfamiliar places or use public transportation, and set real-istic goals or make plans independently of others. (*Id.* at 370–72). Dr. Trum also opined that Plaintiff was moderately limited in his ability to remember locations and work-like procedures, understand and remember very short and simple instruc-tions, understand and remember detailed instructions, perform activities within a schedule, maintain regular attendance and be punctual within customary toleranc-es, sustain an ordinary routine without special supervision, make simple work-related decisions, and be aware of normal hazards and take appropriate precau-tions. (*Id.*).

Dr. Trum performed another medical assessment fourteen months later, on April 9, 2012. (R. at 387–94). Plaintiff feels he's doing okay; he takes his medications most

of the time. (*Id.* at 396). Dr. Trum concluded that Plaintiff has an anxiety related disorder, consistent with Listing 12.06. (*Id.* at 387). She found that Plaintiff has a persistent irrational fear of an activity or situation which results in a compelling desire to avoid the dreaded activity or situation, and suffers from recurrent severe panic attacks. (*Id.*). Dr. Trum also opined that Plaintiff has symptoms consistent with an affective disorder, including anhedonia, sleep disturbance, psychomotor agitation, decreased energy, difficulty concentrating or thinking, hyperactivity, pressures of speech, decreased need for sleep, and easy distractibility. (*Id.* at 388). She concluded that Plaintiff has marked restrictions in activities of daily living, marked difficulties in maintaining social functioning, marked deficiencies in concentration, persistence or pace, and four or more repeated episodes of decompensation. (*Id.* at 390). Moreover, Dr. Trum emphasized that "most of the time" Plaintiff is unable to maintain defense mechanisms in response to his mental impairments. (*Id.*). She also opined that Plaintiff is moderately or markedly limited in understanding and memory, sustained concentration and persistence, social interaction and adaption. (*Id.* at 392–94). Dr. Trum continued folic acid, Zoloft 100mg, Lithium 900mg, and Aplenzin.[5] (*Id.* at 397).

At the hearing, Plaintiff testified that he has trouble managing his mood swings and anger issues. (R. at 57, 60). He avoids driving because he gets road rage. (*Id.* at 44–46). He also avoids shopping because he gets into arguments with the people that he sees. (*Id.* at 50–51). In 2004, he got into a physical altercation with his

---

[5] Aplenzin (bupropion) is an antidepressant medication used to treat major depressive disorder. <www.drugs.com>

neighbor. (*Id.* at 56–57). He has trouble holding a job because he has a difficult time getting along with other people, following instructions, and taking directions. (*Id.* at 47–48, 56).

Plaintiff's wife does most of the household chores. (R. at 53). Plaintiff tries to watch television, but often doesn't know what he's watching. (*Id.* at 54). Plaintiff acknowledged that his medications are helping, but when he takes them he can't function. (*Id.* at 51–52). "It's makes me like I'm in a daze, . . . makes me like a zombie." (*Id.* at 52).

## V. DISCUSSION

### A. ALJ Did Not Properly Evaluate the Treating Psychiatrist's Opinion

Plaintiff began treating with Dr. Trum in October 2008. (R. at 341). Over the next 3½ years, Dr. Trum saw Plaintiff at least 20 times. (*Id.* at 335–44, 373–74, 382–403). On February 22, 2011, Dr. Trum provided an opinion on Plaintiff's mental limitations. (*Id.* at 367–72). She concluded that beginning on or before March 31, 2010, and continuing through the date of her report, Plaintiff had psychomotor agitation or retardation, difficulty concentrating or thinking, and a manic syndrome characterized by hyperactivity, pressures of speech, and easy distractibility. (R. at 367). Dr. Trum opined that Plaintiff had marked restrictions of daily living, marked difficulties maintaining social functioning, and four or more episodes of decompensation. (*Id.* at 368). She also completed a mental RFC assessment, concluding that Plaintiff was moderately or markedly limited in all categories: understanding and

memory, sustained concentration and persistence, social interaction, and adaption. (*Id.* at 370–72).

The ALJ afforded Dr. Trum's opinion "little weight":

> [Dr. Trum] opined that [Plaintiff] had marked limitations in activities of daily living, in maintaining social functioning, and in concentration, persistence or pace, as well as four or more episodes of decompensation. There is no evidence of any such episodes of decompensation in the file. This assessment starkly contrasts with her treatment notes, which state that [Plaintiff] was doing well, improved, and was off all medications. It also contrasts with [Plaintiff's] testimony that he can go to the store, and got along well with his last boss. He testified that he can start and finish a task, although it may take him a long time to finish.

(R. at 31) (citation omitted).

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *accord Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opin-

ion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014) (citing 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1)) (other citation omitted).

Under the circumstances, the ALJ's decision to give little weight to Dr. Trum's opinion is legally insufficient and not supported by substantial evidence. First, the ALJ erred by handpicking which evidence to use to evaluate Dr. Trum's opinion, while disregarding other critical evidence. *Scrogham v. Colvin*, 765 F.3d 685, 696–99 (7th Cir. 2014); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). The ALJ cannot discuss only those portions of the record that support her opinion. *See Myles*, 582 F.3d at 678 ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence. It is not enough for the ALJ to address mere portions of a doctor's report.") (citations omitted); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion."). Instead, the ALJ must consider all relevant evidence, and may not choose to disregard certain evidence or discuss only the evidence that favors his or her decision. *See Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994).

The ALJ erroneously concluded that Plaintiff's treatment notes "state that [Plaintiff] was doing well, improved, and was off medication." (R. at 31). While Plaintiff reported in July 2010 that he was "doing well" and in October 2010 that he stopped taking his medications, his wife stated to Dr. Trum that Plaintiff was still

having anger issues. (*Id.* at 373). A common consequence of bipolar disorder is for the patient to take his medications during his depressive episodes but not during his manic periods. *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011). Plaintiff may have temporarily stopped taking his medications because of the unwanted side effects—Zoloft causing sexual dysfunction, Depakote causing his hands to shake, and Lithium making it impossible to focus and concentrate. (R. at 199, 204, 226). In any event, Dr. Trum did not take Plaintiff off his medications. (*See*, *e.g.*, *id.* at 397) (folic acid, Zoloft 100mg, Lithium 900mg, Aplenzin).

And "doing well" is relative. Plaintiff acknowledged at the hearing that his medications were helping—largely with his anger issues—but further explained that when he takes his medications he can't function—"It makes me like I'm in a daze, . . . makes me like a zombie." (R. at 51–52). *See Martinez*, 630 F.3d at 697 ("antidepressant drugs often produce serious side effects that make patients reluctant to take them."). Moreover, the ALJ exaggerated Plaintiff's testimony. While he does shopping on occasion, he avoids it whenever possible because he gets in arguments with other customers. (R. at 50–51). Similarly, while he generally got along with his last boss, he testified that he has trouble holding a job because he has a difficult time getting along with other people, following instructions, and taking directions. (*Id.* at 47–48, 56). Finally, his testimony about finishing tasks is more nuanced than discussed by the ALJ. When asked if he can start and finish tasks, Plaintiff testified:

> that's a hard one to answer. Yes. And, no. I, I, I can—start things and sometimes finish them. Okay. But it takes me a while to finish them. It

> may be a day or two later, and I'll finish it. Cut, cutting the grass. But,
> I mean, it, it, it—I get side tracked, on, on a, on a lot of things I do.

(*Id.* at 59). It is unlikely that someone who takes a day or two to finish an uncompli-

cated task like cutting the grass is employable.

Further, the very nature of Plaintiff's mental illness is that he has good days and

bad days. Plaintiff has a mood disorder (bipolar disorder), which involves widely

fluctuating symptoms. American Psychiatric Association, *Diagnostic and Statistical*

*Manual of Mental Disorders* 401, 4014 (4th ed. Text Rev. 2000) (A mood disorder

"may involve depressed mood; markedly diminished interest or pleasure; or elevat-

ed, expansive, or irritable mood."); *see Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir.

2008) ("A person who has a chronic disease, whether physical or psychiatric, and is

under continuous treatment for it with heavy drugs, is likely to have better days

and worse days; that is true of the plaintiff in this case. Suppose that half the time

she is well enough that she could work, and half the time she is not. Then she could

not hold down a full-time job."); *Phillips v. Astrue*, 413 Fed. Appx. 878, 886 (7th Cir.

2010) ("The ALJ's assessment of the medical record also demonstrates a misunder-

standing about the nature of mental illness. . . . Many mental illnesses are charac-

terized by 'good days and bad days,' rapid fluctuations in mood, or recurrent cycles

of waxing and waning symptoms."); *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir.

2010) ("More importantly, symptoms that 'wax and wane' are not inconsistent with

a diagnosis of recurrent, major depression."); s*ee also Spiva v. Astrue*, 628 F.3d 346,

348 (7th Cir. 2010) (collecting cases). Even assuming that Plaintiff's "improved"

symptoms were more than an isolated instance, it does not mean that he was capa-

ble of maintaining a full-time work schedule. *See Scott v. Astrue*, 647 F.3d 734, 739–40 (7th Cir. 2011) ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce.").

In any event, Dr. Trum's treatment notes are largely illegible. Under the circumstances, where there are no medical opinions in contrast to Dr. Trum's, the ALJ should have contacted Dr. Trum to clarify the medical record. *Moore*, 743 F.3d at 1127 ("If the ALJ was unable to discern the basis for the treating physician's determination, then the proper course would have been to solicit additional information from Dr. Hier."). Indeed, "[a]n ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004); *see* 20 C.F.R. § 404.1527(c)(3). Thus, "ALJs may contact treating physicians for further information when the information already in the record is 'inadequate' to make a determination of disability." *Skinner*, 478 F.3d at 843.

In rejecting Dr. Trum's opinion, the ALJ concluded that Plaintiff had suffered no episodes of decompensation, and found Dr. Trum's reports of multiple instances of decompensation to be unsupported by the medical evidence. (R. at 31). But decompensation is "not a self-defining phrase" that has a single, specific meaning. *Larson*, 615 F.3d at 750; *Zabala v. Astrue*, 595 F.3d 402, 405 (2d Cir. 2010) (a temporary increase in symptoms); *Rabbers v. Comm'r*, 582 F.3d 647, 660 (6th Cir. 2009) (side effects of medication affecting a claimant's ability to function); *Natale v. Comm'r*, 651 F. Supp. 2d 434, 451–53 (W.D. Pa. 2009) (a history of adjustments to medication

and fluctuating mood); 3 *Social Security Law and Practice* § 42:124 (2010) ("Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation."). The regulations recognize that an episode of decompensation may be inferred from medical records showing a significant alteration in medication, or an incident, like a hospitalization, that signals the need for a more structured psychological support system. 20 C.F.R. pt. 404, subpart P., app. 1, § 12.00; *Larson*, 615 F.3d at 750.

Here, a fair reading of the record indicates that Dr. Trum concluded that "most of the time" Plaintiff was unable to maintain defense mechanisms in response to his bipolar disorder. (R. at 390). This is the standard textbook definition of psychological decompensation. *See Stedman's Medical Dictionary* 366 ("The appearance or exacerbation of a mental disorder due to failure of defense mechanisms."); <https://en.wikipedia.org/wiki/Decompensation#Psychology> ("In psychology, [decompensation] refers to the inability to maintain defense mechanisms in response to stress, resulting in personality disturbance or psychological imbalance."); <https://en.wikipedia.org/wiki/Defence_mechanisms> ("A defence mechanism is a coping technique that reduces anxiety arising from unacceptable or potentially harmful impulses."). While Plaintiff may not have met the Commissioner's standard for decompensation, the ALJ cannot discredit Dr. Trum's opinion merely because she employed the standard psychological definition of decompensation.

Indeed, Dr. Trum's opinion is likely entitled to controlling weight. She is a psychiatric specialist who treated Plaintiff at least 20 times during a 3½ year period. The ALJ did not identify any contradictory evidence by any other medical source. If the treating physician's opinion "is well supported and there is no contradictory evidence, there is no basis on which the administrative judge, who is not a physician, could refuse to accept it." *Bauer*, 532 F.3d at 608 (citation omitted). "Thus, to the extent a treating physician's opinion is consistent with the relevant treatment notes and the claimant's testimony, it should form the basis for the ALJ's determination." *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013) (citation omitted).

In sum, the ALJ failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the Court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth above, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reevaluate the weight to be afforded Dr. Trum's opinion. If the ALJ finds "good reasons" for not giving the opinion controlling weight, *see Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010), the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009), in determining what weight to give the opinion.

## B. The RFC Did Not Properly Account for Plaintiff's Mental Impairment

Even assuming that the ALJ properly weighed Dr. Trum's opinion, the ALJ's RFC assessment did not properly account for Plaintiff's functional limitations. The ALJ determined that Plaintiff was moderately limited in his ability to maintain concentration, persistence or pace. (R. at 29). After examining the medical evidence and giving partial credibility to some of Plaintiff's subjective complaints, the ALJ found that Plaintiff could have performed a full range of work at all exertional levels but with these nonexertional limitations: "[Plaintiff] can have no more than occasional brief and superficial contact with supervisors, co-workers and the general public and is limited to simple, routine and repetitive tasks." (R. at 29–31).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); Social Security Ruling (SSR)[6] 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical

---

[6] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; see 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

In the Seventh Circuit, "both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014); see *O'Connor–Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) ("Our cases, taken together, suggest that the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical."); *Indoranto*, 374 F.3d at 473–74 ("If the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record."); see also SSR 96–5p, at *5 (RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence"); 20 C.F.R. § 404.1545. "Among the mental limitations that the VE must consider are

deficiencies of concentration, persistence, or pace." *Varga v. Colvin*, —F.3d—, No. 14-2122, 2015 WL 4488346, at *4 (7th Cir. July 24, 2015); *see Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (hypothetical question "must account for documented limitations of 'concentration, persistence, or pace'"). Although it is not necessary that the ALJ use the precise terminology of "concentration," "persistence," or "pace," the Court cannot assume that a VE is apprised of such limitations unless he or she has independently reviewed the medical record. *Varga*, —F.3d—, 2015 WL 4488346, at *4; *Yurt*, 758 F.3d at 857. Here, there is no evidence that the VE reviewed Plaintiff's medical history or heard testimony about Plaintiff's moderate limitations in concentration, persistence, or pace. Indeed, the VE testified to having reviewed only Plaintiff's prior work and vocational background. (R. at 62).

The ALJ concluded that Plaintiff had moderate difficulties maintaining concentration, persistence, or pace. (R. at 29). But the ALJ did not address these difficulties in the hypothetical questions she posed to the VE. (*Id.* at 65–66). "Because a hypothetical posed to a VE must incorporate all of [Plaintiff's] limitations supported by the medical record—including moderate limitation in concentration, persistence, and pace— . . . the ALJ committed reversible error." *Varga*, —F.3d—, 2015 WL 4488346, at *4; *see Yurt*, 758 F.3d at 857 (failure of ALJ to include in hypothetical moderate difficulties in concentration, persistence, and pace was reversible error).

Instead of posing a hypothetical that included moderate limitations in concentration, persistence or pace, the ALJ posited a person "limited to simple, routine and repetitive tasks." (R. at 29). These terms refer to "unskilled work," which the

regulations define as work that can be learned by demonstration in less than 30 days. 20 C.F.R. §§ 404.1568, 404.1520. But "whether work can be learned in this manner is unrelated to the question of whether an individual with mental impairments—*e.g.*, with difficulties maintaining concentration, persistence, or pace—can perform such work." *Varga*, —F.3d—, 2015 WL 4488346, at *4. For this reason, the Seventh Circuit has repeatedly rejected the idea that a hypothetical like the one here "confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Yurt*, 758 F.3d at 858–59 (citing *Stewart*, 561 F.3d at 685 (collecting cases)); se*e also Craft*, 539 F.3d at 677–78 (restricting claimant to unskilled, simple work does not account for his difficulty with memory, concentration, and mood swings); *Young*, 362 F.3d at 1004.

The ALJ's hypothetical also clarified that the individual would "have no more than occasional brief and superficial contact with supervisors, coworkers and the general public." (R. at 29). But these limitations also fail to account for Plaintiff's moderate difficulties in maintaining concentration, persistence or pace. Limited interaction with supervisors, coworkers and the public "deals largely with workplace adaption, rather than concentration, pace, or persistence." *Varga*, —F.3d—, 2015 WL 4488346, at *5.

In sum, the ALJ failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing

meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall pose a hypothetical question that explicitly "account[s] for documented limitations of 'concentration, persistence, or pace.'" *Stewart*, 561 F.3d at 684.

## C. Other Issues

Because the Court is remanding on the treating physician and RFC issues, the Court chooses not to address Plaintiff's other arguments. Nevertheless, on remand, after determining the appropriate weight to be afforded Dr. Trum's opinion, the ALJ shall reassess Plaintiff's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate whether Plaintiff had an impairment or combination of impairments that met or medically equaled the severity of any of the listings enumerated in the regulations. The ALJ shall then reevaluate Plaintiff's mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of her findings in accordance with applicable regulations and rulings. Finally, with the assistance of a VE, the ALJ shall determine whether there were jobs that existed in significant numbers that Plaintiff could have performed.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [16] is **GRANTED**, and Defendant's Motion for Summary Judgment [22] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and

the case is remanded to the Commissioner for further proceedings consistent with this opinion.

ENTER:

Dated: August 25, 2015

_Mary M Rowland_

_____
MARY M. ROWLAND
United States Magistrate Judge